# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
### Civil Action No. 3:13-cv-31

| | |
|---|---|
| CACERES DRYWALL CORPORATION, Individually and on Behalf of All Others Similarly Situated, <br><br>     *Plaintiff*, <br><br> vs. <br><br> NATIONAL GYPSUM COMPANY a/k/a NEW NGC, INC.; GOLDEN EAGLE INDUSTRIES, INC. a/k/a SPANGLER COMPANIES, INC.; LAFARGE NORTH AMERICA INC., LAFARGE S.A. a/k/a LAFARGE WORLDWIDE; AMERICAN GYPSUM COMPANY LLC, GEORGIA-PACIFIC LLC; USG CORPORATION; L&W SUPPLY CORPORATION; CERTAINTEED CORPORATION; SAINT-GOBAIN CORPORATION; SAINT-GOBAIN S.A. a/k/a COMPAGNIE DE SAINT-GOBAIN; TIN INC. d/b/a TEMPLE-INLAND INC.; PABCO BUILDING PRODUCTS, LLC, <br><br>     *Defendants*. | CLASS ACTION COMPLAINT <br><br> JURY TRIAL DEMANDED |

    NOW COMES Plaintiff, Caceres Drywall Corporation, for its Complaint brought under Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1-2, and Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15 & 26, for treble damages, injunctive relief, and costs of suit, against Defendants National Gypsum Company a/k/a New NGC, Inc.; Spangler Companies, Inc. a/k/a Golden Eagle Industries, Inc.; LaFarge North America, Inc., LaFarge S.A. a/k/a LaFarge Worldwide; American Gypsum Company LLC, Georgia-Pacific LLC; USG Corporation; L&W Supply Corporation; CertainTeed Corporation; Saint-Gobain Corporation a/k/a Compagnie de

Saint-Gobain; Saint-Gobain S.A.; TIN, Inc. d/b/a Temple-Inland Inc.; and PABCO Building Products, LLC.

## **TABLE OF CONTENTS**

I.     NATURE OF ACTION ................................................................................................1

II.    JURISDICTION AND VENUE ...............................................................................4

III.   PARTIES ...................................................................................................................5

    **A.**   Plaintiff ................................................................................................................5

    **B.**   Defendants ..........................................................................................................5

IV.    CLASS ACTION ALLEGATIONS .......................................................................10

V.     THE DRYWALL INDUSTRY IS CONDUCIVE TO CONSPIRACY .............12

    **A.**   Drywall ..............................................................................................................12

        **1.**   Drywall possesses many of the characteristics of a commodity ..................12

        **2.**   Imported Drywall is no substitute for domestic drywall .............................12

    **B.**   Industry Structure ...........................................................................................13

        **1.**   High Concentration.......................................................................................13

        **2.**   High Barriers to Entry ..................................................................................14

        **3.**   Inelastic Demand ..........................................................................................15

        **4.**   The Drywall Industry's History of Antitrust Violations ..............................15

VI.    THE CONSPIRACY ...............................................................................................16

    **A.**   Defendants' Coordinated Price Increase Announcements .......................19

        **1.**   The Early Days of the Conspiracy................................................................19

        **2.**   Price Increase Announcements, 2011-2012 .................................................21

    **B.**   Defendants' Concerted Elimination of Job Quotes ..................................26

    **C.**   Defendants' Concerted Supply Restrictions.............................................29

    **D.**   Defendants' Most Recent Coordinated Price Increase Now Going Into Effect ........31

VII.   FRAUDULENT CONCEALMENT .......................................................................33

VIII.  COUNT I: SHERMAN AND CLAYTON ANTITRUST ACTS FOR TREBLE DAMAGES AGAINST ALL DEFENDANTS .......................................................33

IX.    COUNT II: SHERMAN AND CLAYTON ANTITRUST ACTS FOR INJUNCTIVE RELIEF AGAINST ALL DEFENDANTS ............................................................34

X.     COUNT III: UNJUST ENRICHMENT FOR DISGORGEMENT UNDER THE COMMON LAW OF NORTH CAROLINA..............................................................................35

XI.    PRAYER FOR RELIEF ....................................................................................................... 37

XII.   DEMAND FOR JURY TRIAL ............................................................................................. 38

iii

Based upon personal knowledge, information, belief, and the investigation of counsel, Plaintiff alleges as follows:

## I.    NATURE OF ACTION

1.    Plaintiff brings this Action on behalf of it and all other direct purchasers of drywall in the United States, to recover treble damages and other relief based on Defendants' unlawful conspiracy, from at least January 1, 2008 to the present, to fix, raise, peg, maintain, and stabilize the price of drywall sold in the United States.

2.    Defendants manufacture and sell nearly 100% of the drywall in the United States for residential and commercial construction. Drywall, also known as wallboard, gypsum board sheetrock and/or plasterboard, is the fundamental building component for walls and ceilings of houses, condominiums, apartments, and office and other commercial buildings. Drywall is used in repair, remodeling and improvement, as well as in new construction. It is used in over 90 percent of all new residential and commercial construction projects in the United States. Drywall accounts for 4-5% of the cost of a new home.

3.    The conspiracy is an outgrowth of the largest housing crash in U.S. history in late 2007. The decline in demand for housing during real estate downturn produced a corresponding decline in demand for drywall, resulting in tremendous overcapacity. The decline in demand translated to lost profits and the threat of further lost profits to Defendants. In the face of this decreased demand, Defendants attempted to, and actually did, increase prices – something that they would not, nor could not, have done in a competitive market.

4.    As a matter of basic business and economics, however, Defendants, faced with an increase in supply and a decline in demand would have lowered prices to win business in 2008 and

beyond. Instead, Defendants defied gravity, by increasing prices threatening to continue to increase prices, in the face of decreased demand, contrary to the laws of economics. Absent the alleged conspiracy, this could not, and would not, have happened. Drywall prices would have languished with housing prices.

5.     Defendants reached illegal agreements to increase prices and restrain trade at trade association and meetings and other industry functions.

6.     Defendants implemented their conspiracy largely through coordinated price increases and other coordinated pricing a policies and output restrictions. On multiple occasions from 2008 to present, each of the drywall manufacturers made price increase announcements at the same time; using the same language; for the same amounts; to become effective on or about the same date.

7.     Defendants had some success from 2008 to 2011. They overcharged direct purchasers substantial amounts. Drywall prices and total construction spending historically rose or fell together. During the housing boom they both rose. During the house crash, they both fell – but only for a while. While construction spending continued to fall through and beyond 2008, drywall price didn't; and, in fact, they rose. This was the result of a conspiracy. Defendants agreed to fix and maintain artificially high prices and actually did succeed in doing so from 2008-2011, earning artificially high revenues at the expense of Plaintiff and the Class – all, or nearly all, of which suffered overcharge damages.

8.     In Fall 2011, defendants improved the efficacy of their ongoing scheme by adding other acts and practices in furtherance of the conspiracy. In an abrupt change in the longstanding industry practice, each of the Defendants simultaneously abolished the pricing practice known as "job pricing," which had been an integral part of the drywall business, historically. It better

enabled Defendants to maintain price increases and monitor their coconspirators' compliance with the illegal agreement. Defendants also agreed to reduce production to further add to the success of the conspiracy.

9. After implementing the additional restraints in January 2012, Defendants continued to overcharge Plaintiff and the Direct Purchaser Plaintiff Class for drywall by even more significant amounts. With no reasonable alternatives available to them, Plaintiff and the Direct Purchaser Plaintiff Class paid, and continue to pay, supra-competitive high prices to Defendants, who reaped, and continue to reap, artificially high profits. Absent the alleged conspiracy, and acts and practices in furtherance thereof, this could not, and would not, have happened.

10. Defendants intended to and actually did restrain trade. They shared a conscious commitment to a common scheme designed to achieve the unlawful objective of artificially fixing, raising, pegging, maintaining and stabilizing the price of drywall sold in the United States by coordinating price increase announcements, capacity restrictions, and anticompetitive sales and pricing policies.

11. The nature of the drywall product and the characteristics of the drywall market enabled Defendants to achieve their unlawful objective. Drywall has no reasonably functional substitutes, thus enabling manufacturers of drywall to control the market without fear that purchasers might turn to an alternate product.

12. Moreover, because of the safety and quality concerns associated with imported drywall, particularly Chinese drywall, there are no reasonable substitutes for domestically produced drywall. Because Defendants make and sell nearly 100% of domestic drywall, there are no alternatives but to buy drywall from Defendants – no matter how anticompetitive the price.

3

13.     Having been overcharged by Defendants, Plaintiff and the Direct Purchaser Plaintiff Class were injured in their business or property by reason of Defendants' conspiracy and acts and practices in furtherance thereof.  Plaintiff and the Direct Purchaser Plaintiff Class seek redress under federal and state law for treble damages, injunctive relief, disgorgement, and their costs of suit against Defendants.

## II.     JURISDICTION AND VENUE

14.     Plaintiff brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries that Plaintiff and the Direct Purchaser Plaintiff Class have suffered from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C.  § 1.

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337 & 1367, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26.

16.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C. § 1391(b), (c) and (d) because during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the alleged activity affected interstate trade and commerce discussed below has been carried out in this District.

17.     Defendants' conduct, as described in this Complaint, were within the flow of, were intended to, and did have a substantial effect on, the interstate commerce of the United States, including in this District.

18.     During the Class Period, Defendants manufactured, sold and shipped drywall in a continuous and uninterrupted flow of interstate commerce.  The price-fixing conspiracy in which

4

the Defendants participated had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

19.     During the Class Period each Defendant, or one or more of its affiliates, used the instrumentalities of interstate commerce, including interstate railroads, highways, waterways, wires, wireless spectrum, and the U.S. mail, to join or effectuate their conspiracy.

20.     This Court has personal jurisdiction over each Defendant, because each Defendant – throughout the United States and including in the District of North Carolina – transacted business, sold drywall, maintained substantial contacts, and/or committed overt acts in furtherance of their illegal scheme and price-fixing conspiracy.  The conspiracy was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

21.     Defendant National Gypsum Company a/k/a New NGC, Inc., which sold approximately 23% of the drywall in the United States in 2011, is headquartered in Charlotte, North Carolina.

### III.     PARTIES

#### A.     Plaintiff

22.     Plaintiff CACERES DRYWALL CORPORATION ("Plaintiff") is a Florida corporation with its principal place of business in Miami, FL.  Plaintiff is the assignee of the claims of a direct purchaser, which, during the Class Period, purchased drywall directly from one or more Defendants, and which suffered antitrust injury and damages, in the form of overcharges.

#### B.     Defendants

23.     Defendant NATIONAL GYPSUM COMPANY a/k/a NEW NGC, INC. ("National Gypsum") is a Delaware corporation headquartered in Charlotte, North Carolina.  During the Class

5

Period, National Gypsum manufactured and directly sold drywall to purchasers in the United States, including to members of the Direct Purchaser Plaintiff Class. In 2011, National Gypsum sold approximately 23% of the drywall in the United States.

24. Defendant GOLDEN EAGLE INDUSTRIES, INC. a/k/a SPANGLER COMPANIES, INC. ("Golden Eagle") is a North Carolina corporation headquartered in Charlotte, North Carolina. During the Class Period, Golden Eagle manufactured and directly sold drywall to purchasers in the United States, including to members of the Direct Purchaser Plaintiff Class. It owns and controls National Gypsum and its 23% of sales of drywall in the United States.

25. Defendant LAFARGE NORTH AMERICA INC. ("LaFarge") is a Maryland corporation headquartered in Reston, Virginia. During the Class Period, LaFarge manufactured and sold drywall to purchasers in the United States, including to members of the Direct Purchaser Plaintiff Class. In 2011, LaFarge sold approximately 8% of the drywall in the United States.

26. Defendants LAFARGE S.A. a/k/a LARFARGE WORLDWIDE ("LaFarge Worldwide") is a French *société anonyme* headquartered in Paris, France. During the Class Period, LaFarge Worldwide manufactured and directly sold drywall to purchasers in the United States, including to members of the Direct Purchaser Plaintiff Class. Lafarge Worldwide is a multinational conglomerate present in 64 countries, including in the U.S. LaFarge Worldwide owns 100% of LaFarge and its 8% of sales of drywall in the United States.

27. Defendant AMERICAN GYPSUM COMPANY LLC ("American Gypsum") is a Delaware corporation headquartered in Dallas, Texas. During the Class Period, American Gypsum manufactured and directly sold drywall to purchasers in the United States, including to members of the Direct Purchaser Plaintiff Class. In 2011, American Gypsum sold approximately 10% of the drywall in the United States.

6

28.     Defendant GEORGIA-PACIFIC LLC ("Georgia-Pacific") is a Delaware corporation headquartered in Atlanta, Georgia.    During the Class Period, Georgia-Pacific manufactured and directly sold drywall to purchasers in the United States, including to members of the Direct Purchaser Plaintiff Class.   In 2011, Georgia-Pacific sold approximately 10% of the drywall in the United States.

29.     Defendant USG CORPORATION ("USG") is a Delaware corporation headquartered in Chicago, Illinois.   During the Class Period, USG manufactured and directly sold drywall to purchasers in the United States, including to members of the Direct Purchaser Plaintiff Class.  In 2011, USG sold approximately 25% of the drywall in the United States.

30.     Defendant L&W SUPPLY CORPORATION ("L&W") is wholly owned by USG. It is a Delaware corporation headquartered in Chicago, Illinois.   In 2011, L&W directly sold a substantial portion of the approximately 25% of the drywall in the United States sold by USG and U.S. Gypsum.  L&W owns and controls and does business in the U.S., including directly selling drywall, under the following owned and controlled entities and/or aliases:

- Acoustical & Drywall Supply;

- Acoustical Material Supply Inc.;

- Alabama Drywall Supply;

- All-Interior Supply Inc.;

- Arch City Drywall Supply;

- Arrowhead Drywall Supplies;

- Barnett Drywall & Supply;

- Builders Supply;

- Building Specialties;

7

- CalPly;

- Capitol Drywall Supply;

- Chicago Area Building Specialties (CABS);

- CK Supply;

- Desert Building Materials;

- E-C Drywall Supply;

- Great Lakes Gypsum & Supply;

- Indianapolis Drywall Supply;

- M & S Drywall Supply;

- River City Materials;

- Seacoast Supply;

- Wabash Valley Supply;

- Wausau Brick & Gypsum; and

- Wisconsin Drywall Distributors.

31.     During the Class Period, entities or aliases (i) through (xxiii) (collectively the "USG aliases") directly sold drywall in the United States, including a substantial portion of the approximately 25% of the drywall in the United States sold by USG and L&W.

32.     Defendant CERTAINTEED CORPORATION ("CertainTeed") is a corporation organized, existing, and doing business under the laws of the State of Delaware, with its headquarters in Valley Forge, Pennsylvania.  During the Class Period, CertainTeed manufactured and directly sold drywall to purchasers in the United States, including to members of the Direct Purchaser Plaintiff Class.  In 2011, CertainTeed sold approximately 10% of the drywall in the United States.

8

33.     Defendant SAINT-GOBAIN CORPORATION (Saint-Gobain) is a Pennsylvania corporation headquartered in Valley Forge, Pennsylvania.  During the Class Period, Saint-Gobain manufactured and directly sold drywall to purchasers in the United States, including to members of the Direct Purchaser Plaintiff Class.  It owns and controls CertainTeed and its 13% of sales of drywall in the United States.

34.     Defendant SAINT-GOBAIN S.A. a/k/a COMPAGNIE DE SAINT-GOBAIN ("Saint-Gobain Global") is a French *société anonyme* headquartered in Courbevoie, France. During the Class Period, Saint-Gobain Global manufactured and directly sold drywall to purchasers in the United States, including to members of the Direct Purchaser Plaintiff Class.  It is a multinational conglomerate that owns and controls CertainTeed and its 13% of sales of drywall in the United States.

35.     Defendant TIN INC. d/b/a TEMPLE-INLAND ("Temple-Inland") is Delaware corporation with headquartered in Austin, Texas.  During the Class Period, Temple-Inland manufactured and directly sold drywall to purchasers in the United States, including to members of the Direct Purchaser Plaintiff Direct Purchaser Plaintiff Class.  In 2011, Temple-Inland sold approximately 7% of the drywall in the United States.

36.     Defendant PABCO BUILDING PRODUCTS, LLC ("PABCO") is a California corporation headquartered in Rancho Cordova, California.  During the Class Period, PABCO manufactured and sold drywall directly to purchasers in the United States, including to members of the Direct Purchaser Plaintiff Class.  In 2011, PABCO sold approximately 4% of the drywall in the United States.

37.     The acts taken by Defendants, as alleged herein, were authorized, ordered and condoned by their respective parent companies and authorized, ordered and performed by their

officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of their business affairs.

38.     Various other persons, corporations, or firms not named as Defendants herein have participated in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

39.     Each defendant acted as the principal, agent, or joint venture of, or for, other defendants with respect to the acts, violations, and conduct alleged by Plaintiff.

## IV.     CLASS ACTION ALLEGATIONS

40.     Plaintiff brings this action pursuant to Rules 23(a) and 23(b)(2) & (b)(3) of the Federal Rules of Civil Procedure on behalf of a class of plaintiffs (the "Direct Purchaser Plaintiff Class") consisting of:

**All persons or entities that directly purchased wallboard in the United States directly from any of the Defendants, their subsidiaries, affiliates or joint-ventures from January 1, 2008 through the present.**

41.     Excluded from the Direct Purchaser Plaintiff Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government.

42.     The Direct Purchaser Plaintiff Class numbers in at least the thousands, the exact number and identities of the members being known by Defendants.

43.     The Direct Purchaser Plaintiff Class is so numerous and geographically dispersed that joinder of all members is impracticable.

44.     There are questions of law and fact common to the members of the Direct Purchaser Plaintiff Class.  These common questions relate to the existence of the conspiracy alleged, and to

10

the type and common pattern of injuries sustained as a result thereof.  The questions include, but are not limited to:

- Whether Defendants engaged in a contract, combination, or conspiracy to restrain trade;

- Whether Defendants unreasonably restrained trade;

- The nature and character of the acts performed by Defendants in furtherance of the alleged conspiracy;

- Whether Defendants charged higher prices than they otherwise would have charged as a proximate result of Defendants' conduct alleged herein;

- Whether the alleged contract, combination, and conspiracy violated Section 1 of the Sherman Act;

- The anticompetitive effects of Defendants' violations of law;

- Whether Defendants have acted or refused to act on grounds generally applicable to the Direct Purchaser Plaintiff Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Direct Purchaser Plaintiff Class as a whole; and

- Whether the conspiracy had the effect of artificially inflating the price of drywall sold in the United States during the Class Period;

- Whether the conduct of the Defendants caused injury to Direct Purchaser Plaintiff Class members; and

- The measure and amount of damages incurred by the Direct Purchaser Plaintiff Class.

45.     The questions of law and fact common to the members of the Direct Purchaser Plaintiff Class predominate over any questions affecting only individual members, including the legal and factual issues relating to liability and damages.

46.     Each Plaintiff is a member of the Direct Purchaser Plaintiff Class.  Plaintiff's claims are typical of the claims of other members of the Direct Purchaser Plaintiff Class, and it will fairly and adequately protect the interests of the members of the Direct Purchaser Plaintiff Class.  Its

11

interests are aligned with, and not antagonistic to, those of the other members of the Direct Purchaser Plaintiff Class.

47.    Plaintiff is represented by counsel competent and experienced in complex class action antitrust litigation.

48.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Class treatment will permit the adjudication of relatively small claims by members of the Direct Purchaser Plaintiff Class who otherwise could not afford to litigate antitrust claims such as are asserted in this Complaint.

49.    This class action presents no difficulties of management that would preclude its maintenance as a class action.

## V.    THE DRYWALL INDUSTRY IS CONDUCIVE TO CONSPIRACY

### A.    Drywall

#### 1.    Drywall possesses many of the characteristics of a commodity

50.    The Gypsum Association, an industry group controlled by Defendants, describes drywall as "a family of sheet products consisting of a noncombustible core primarily of gypsum with a paper surfacing or facing." Drywall possesses many of the characteristics of a commodity product.  The drywall products of the Defendants are functionally interchangeable – the drywall produced by one Defendant does not differ significantly in quality, appearance or use from that produced by another Defendant.  Drywall is produced and sold in standard dimensions.  Where there is competition in commodity markets, price is the principal driver of competition.

#### 2.    Imported Drywall is no substitute for domestic drywall

51.    Moreover, because of the safety and quality concerns associated with imported drywall, particularly Chinese drywall, there are no reasonable substitutes for U.S. drywall.

12

Because Defendants make and sell nearly 100% of U.S. drywall, there are no alternatives but to buy drywall from Defendants – no matter how anticompetitive the price set by Defendants.

52.    A 2009 study of the gypsum industry conducted for the Gypsum Association found the value of "put-in-place" wallboard in residential construction to be approximately $35 billion in 2008. Of that total, approximately 20% ($7 billion) was wallboard material cost. In 2008, residential construction accounted for approximately $500 billion in total "spend costs" and accounted for approximately 45% of total U.S. construction direct spending.

**B.    Industry Structure**

**1.    High Concentration**

53.    High market concentration facilitated not only the fixing of prices but also the coordination of pricing terms, including the elimination of job quote pricing.

54.    As reflected in Figure 1, Defendants collectively account for virtually 100% of the drywall sold in the United States and Canada. The three largest Defendants account for more than 60% of the U.S. sales of drywall.



Figure 1

13

55.     Sales of drywall in the United States are made almost entirely by large corporations each with substantial shares of total sales.  The major manufacturers of drywall have annual sales of more than $5 billion dollars.  This increased concentration of drywall sales facilitated the conspiracy because a potential cartel would need only to conspire with and police a limited number of companies to be successful.

### 2.     High Barriers to Entry

56.     High barriers to entry have prevented new entrants into the market despite the artificial inflation of prices and coordinated elimination of job pricing.

57.     Entry into the drywall market involves significant start-up capital expenditures.  A new entrant into the business would have to incur tens, if not hundreds, of millions of dollars in costs, including capital expenditures on plants and equipment, regulatory approvals, as well as transportation, electricity, infrastructure for distribution, and labor.  The equipment needed to manufacture drywall is custom-built and would take several years before it could become operational.

58.     Because drywall manufacturers are vertically integrated, to compete effectively in the market a new entrant would not only have to acquire the means to produce the major inputs into drywall, such as access to a limited number of gypsum mines, but would also need to acquire the means to refine these inputs into finished drywall, and to place the product into the marketplace.

59.     The major manufacturers already maintain networks of distribution centers which not only make products available, but provide advice about the products as well as information

about new product developments to customers. This downstream capability is imperative to competing successfully in this industry and would take time as well as capital in order to replicate.

### 3. Inelastic Demand

60. Because the price for drywall is highly inelastic, Defendants were able to collectively raise prices to supra-competitive levels without losing revenues.

61. Pricing for drywall is highly inelastic in large part because there are no adequate substitutes. Drywall is used in virtually all new construction and renovation projects for commercial or residential structures throughout the United States, and because there is no functionally equivalent product, drywall must be purchased for these projects. There are no close substitutes for drywall that builders can use as a replacement.

62. Drywall has no reasonably functional substitutes, thus enabling manufacturers of drywall to control the market without fear that purchasers might turn to an alternate product. This is because drywall differs from other construction materials in its composition, functional characteristics, customary uses, and low cost. It is also different from other construction materials such as plaster or lumber because of its ease of application, smooth finish and fire- resistant and moisture-controlling qualities.

63. A hypothetical small but significant increase in the price of drywall by a cartel would not cause a significant number of purchasers to utilize other materials in lieu of drywall, nor would such a hypothetical price increase cause so much switching to other products that the increase would be unprofitable.

### 4. The Drywall Industry's History of Antitrust Violations

64. The Defendants have engaged in similar anticompetitive behavior. In 2002, the European Union fined four gypsum companies $455 million dollars for engaging in a price-

15

fixing scheme for drywall and other products between 1992 and 1998. Two of these companies – Lafarge and BPB PLC (which merged with CertainTeed in the United States) – sell in the United States and are Defendants in this action.

65. Defendants have a history of conspiring to restrain trade in drywall. *See, e.g.*, *United States v. Gypsum Co.*, 438 U.S. 422 (1978), *on remand*, *United States v. United States Gypsum Co.*, 600 F.2d 414, 419-20 (3d Cir. 1979).

## VI.     THE CONSPIRACY

66. In August 2007, after a years' long bubble in the residential (and to a lesser extent commercial) real estate market, housing prices crashed. Housing demand fell drastically, construction spending soon fell. As they had historically, the trajectory of prices of Gypsum drywall followed that of construction spending.

67. Gone were the Halcyon days of high profits for Defendants during the housing boom of the early to mid-2000's – like much of the rest of the country's industry – and Defendants were losing money at an alarming rate. As reflected in Figure 2, from mid-2007 through early-2008, both private construction spending and the gypsum price index plummeted along the same downward trajectory, moving together as they had for years.

16



Figure 2

68.     In a Q1 2008 earnings conference call, the Chairman and CEO of Defendant USG

summed things up to investors:

> I wish I had great news to report today; unfortunately I do not. We reported a loss of
> $45 million in the quarter. ***Market conditions continue to be extremely
> challenging.*** Both segments of the housing market, new construction and
> repair/remodel, are weak. New residential construction eroded further in the first
> quarter of 2008. Consensus forecasts for housing starts have been revised downward
> again with projections slightly below 1 million units for the year.  It can feel like an
> eternity, but it wasn't really that long ago that housing starts were at more than 2
> million units per year. ***So as far as new residential construction is concerned,
> we're dealing with a market segment that has fallen more than 50% from a
> relatively recent peak in early 2006.*** The repair/remodel market has weakened as
> well. The large national home improvement retailers who are important customers
> of ours have reported that they expect same-store sales to fall in 2008.   The
> commercial market which had remained relatively stable during the collapse of the
> housing market may have reached its peak.

69.     Despite these market conditions, however, it is at this time that the trajectories of

private construction spending and the gypsum price index diverged.  While private construction

17

spending continued a rapid descent, the gypsum price index stopped falling and even bounced up; defying economic gravity. Starting in early 2008, despite record low demand, Defendants began announcing and implementing price increases in order to stem their mounting losses.

70.     Thus, in that same Q1 2008 earnings conference call, the Chairman and CEO of Defendant USG continued:

> Indeed not all the news, though, I have to share is bad. There are some encouraging signs in the market and some very positive results that we've achieved by focusing on the **_controllable elements of our business_**. Some of those achievements are obscured by the recession and the corresponding decline in our results. But these improvements are real and I'd like to highlight some of them before I turn the call over to Jim and Rick.  First, the decline in wallboard prices stopped in the first quarter. As you might recall from our fourth-quarter call, we said that the rate of decline in wallboard prices had slowed. That trend continued early in the first quarter this year and **_toward the end of the quarter we announced and achieved a price increase._** The increase during the quarter was modest, but it is important because **_it represents the first increase in wallboard prices in more than 15 months._**

71.     As a matter of fundamental economics, price is not a "controllable element" in a competitive business.  Only with the market power possessed by a monopolist or achieved by colluding with competitors, would USG (in concert with its competitors) have the power to control price.

72.     With a share of 28% of the drywall sales in the United States, USG is a powerful competitor, but it does not have a monopoly.  To have the power to control price, therefore, USG would have to conspire with its competitors.  Thus, in the absence of a conspiracy, USG would not have been able to "announce and achieved a price increase," which was "first increase in wallboard prices in more than 15 months."

18

A.    **Defendants' Coordinated Price Increase Announcements**

1.    **The Early Days of the Conspiracy**

73.    In early 2008, drywall manufacturers announced two sets of 10% price increases for nationwide.  The first of these was implemented in February 2008, and the second was announced in March 2008 to be effective April 1, 2008.   According to industry reports, Defendants' significant losses in 2007 precipitated the "need" for the price increase.  For example, defendant Lafarge Gypsum reported a 30% decrease in sales performance in the final quarter of 2007 and defendant USG announced a $74 million loss during the same period of October – December 2007. These price increases during a time of decreasing demand was against the unilateral economic interest of each defendant – absent a conspiracy.

74.    There were further price increase announcements in 2008-2010 that at least certain Defendants made at similar times for similar amounts.   As sophisticated commercial entities, Defendants would not have attempted to or actually implemented given the state of the market in 2008, as reflected in Figure 2.

75.    For example, on August 12, 2008, National Gypsum announced it would be increasing prices for its entire drywall product line nationwide by 10%, effective October 13, 2008. Then, USG announced it would be increasing prices for drywall nationwide by 12%, also effective October 13, 2008.

76.    To be implemented in January 2009, both USG and National Gypsum announced in November identical 15% price increases to take effect nationwide.  On November 14, 2008, National Gypsum announced that it would be increasing prices for drywall nationwide by 15%, effective January 5, 2009.  On November 26, 2008, USG also announced a 15% price increase on drywall, effective nationwide January 1, 2009.

19

77. In early 2010, both USG and National Gypsum announced identical 20% price increases to take effect nationwide on the same day. On February 12, 2010, USG announced a 20% price increase on drywall, effective nationwide on March 15, 2010. On February 15, 2010, National Gypsum also announced a 20% price increase on drywall, also effective nationwide on March 15, 2010.

78. In April 2010, there were numerous nearly simultaneous price increase announcements in April 2010 for implementation in May 2010. On April 6, 2010, National Gypsum announced a 20% price increase on drywall, to become effective nationwide on May 10, 2010.

- On April 7, 2010, CertainTeed announced a 20% price increase on drywall, also effective nationwide on May 10, 2010.

- On April 7, 2010, Lafarge announced a 20% price increase on drywall, also effective nationwide on May 10, 2010.

- On April 7, 2010, American Gypsum announced a 20% price increase on drywall, effective nationwide on May 8, 2010.

- On April 9, 2010, USG announced a 20% price increase on drywall, also effective nationwide on May 10, 2010.

79. Prior to the effective date of these announcements, Defendants met under the auspices of their controlled trade association, the Gypsum Association, at The Woodlands in Texas.

80. A November 3, 2010 memorandum from Defendant USG led a significant price increase by at least five major drywall producers. Following USG's announcement of a 25% price increase as of December 6, 2010, Defendants CertainTeed, National Gypsum, Lafarge Gypsum and Temple-Inland all released strikingly similar announcements publicizing price spikes of 25%.

20

However, increasing price during a time of decreasing demand was against the unilateral economic interest of each defendant – absent a conspiracy.

### 2. Price Increase Announcements, 2011-2012

81.     In Fall 2011, Defendants announced in concert a 35% increase in the price of drywall, despite continuing low demand.  The price increase in drywall announced in the fall of 2011 was the largest in more than a decade.  All of the Defendants indicated that this price increase would be implemented on or about January 1, 2012.  However, increasing price during a time of decreasing demand was against the unilateral economic interest of each defendant – absent a conspiracy.

82.     The Defendants' large spike in drywall prices was not in response to – or in expectation of – an increase in demand for drywall.  To the contrary, Defendants anticipated flat demand, warning investors in 2012 that "demand for drywall would be no better this year than last." National Gypsum stated that wallboard demand "has been essentially flat and at historically low levels" and projected that the "outlook for the next 12 to 18 months might at best be described as a slow 'climb out.'" CertainTeed projected in October 2011 that "[t]he housing market is still anemic with little expectation of real improvement in the coming year." Similarly, in October 2011, USG believed that the market is "going to be flat next year."

83.     Prior to the collusive Fall 2011 price increase announcements at issue, drywall prices had been in a three-month period of decline, falling 0.6% in July 2011, 1.7% in August 2011 and 1.7% in September 2011.

84.     Faced with a weak market with no immediate prospect of rebound, the Defendants nevertheless announced a large spike in the price of drywall.  This increase was not supported by

21

competitive conditions and thus could not have been sustained absent the Defendants' agreement to raise prices.

85.     The National Association of Home Builders analyzed the proposed 35% price increase and determined that the hike "is out of proportion given the currently weak housing market."  The NAHB found that home builders would be unable to absorb increase input costs, as builders already reported margins squeezed to the bare minimum. Any increase in cost thus would be passed on to the home buyer, which would serve to weaken housing demand by influencing the number of households that could afford a median-priced new home.

86.     To announce these drastic changes, Defendants issued price increase letters or otherwise communicated with their customers in late 2011 setting out these plans.  The Fall 2011 price increase letters included key language describing their actions that was remarkably similar, the effective date for imposition of the price increases was virtually identical, and the duration of the price increases was the same. For example:

- On September 20, 2011, Defendant American Gypsum told customers nationwide that "Effective January 1, 2012, we will implement a 35% price increase on all gypsum wallboard products.  This increased price (up 35%) will be your price for the entire year 2012.  This increase applies to all segments of the business."

- On September 30, 2011, Defendant National Gypsum told customers nationwide that "National Gypsum Company will implement a price increase of 35% on all wallboard products, to be effective on January 1, 2012.  It is our intention that the resultant price (up 35%) will apply for all 2012."

- On October 3, 2011, Defendant CertainTeed (Saint-Gobain) wrote to inform its customers that they would receive a new price schedule on November 15 for "all wallboard products." CertainTeed subsequently told customers that "our price increase, intended to be in effect for the calendar 2012 year, will range between 35% and 37% for all gypsum wallboard products."

- On October 4, 2011, Defendant Lafarge North America Inc. informed its customers nationwide that "on Monday, January 2nd 2012 we will implement a 35% increase on all our wallboard products."

22

- On October 12, 2011, Defendant PABCO Gypsum told customers nationwide that "Effective January 1, 2012, PABCO Gypsum will implement a 35% price increase across all product lines. This increase will establish pricing for the calendar year 2012."

87.     Defendants USG, Temple-Inland, Inc. and Georgia-Pacific LLC also communicated to customers that they would be imposing substantial price increases effective on or about January 1, 2012 and those increases would remain in place for the entire year.

88.     The price increase announcements were led by defendant American Gypsum, which had a small market share relative to industry leaders like defendants USG and New NGC. Absent assurances and agreement that its "competitors" would follow, such "leadership" by a small player would have been contrary to American Gypsum's self-interest given the market conditions described below. Because drywall is a commodity product, in the absence of collusion Defendants' price increases would have contravened each Defendant's independent self-interest, as anyone could have profited and gained market share by undercutting the others during a period where the Defendants had substantial unused capacity.

89.     Contrary to prior history in the industry, Defendants not only announced these coordinated price increases in late 2011, they then successfully maintained much higher prices throughout 2012. These increases were imposed despite a soft construction market. Defendants also maintained substantially higher prices in the face of significant industry overcapacity that would have made it virtually impossible for any Defendant independently to impose and maintain a substantial price increase on its customers in the absence of collusion.

90.     These actions were described by one distributor to its customers in December 2011 as follows: "As you are probably now aware, all the drywall manufacturers have revised their pricing strategies beginning in 2012. The manufacturer letters that have been published vary

23

slightly from manufacturer to manufacturer but it amounts to approximately 35% across the gypsum wallboard category."

91.     The large 2012 price increase was also not reflective of increased costs of producing and selling drywall. The costs of the major inputs into drywall were stable or even falling in the 2011-2012 period. Moreover, most of the Defendants are vertically integrated companies, and thus have the ability to control to a certain extent the biggest cost inputs of drywall – gypsum and paper – because they mine or produce these materials themselves.

92.     Absent collusion, if input costs remain stable or fall and demand is flat, prices would be expected to remain flat or fall as well. The fact that prices rose substantially and for all Defendants in 2012, despite competitive conditions dictating stable or falling prices, is indicative of collusive behavior. Here, Defendants were able to increase prices for drywall even in the face of stable input costs and flat demand without fear that their customers could turn to competitors who were selling at a lower price because of their conspiracy as alleged herein.

93.     For example, the Associated General Contractors of America reported that construction prices as a whole declined by 1.1% between October and November 2012; however, this overall decrease was offset by a 0.4% increase in gypsum products such as wallboard. In a year of falling prices overall, wallboard stood as the stark exception, as the price jumped by 14.9% during the 2012 year.

94.     Moreover, these price increases were imposed at a time when there was substantial overcapacity in the industry. In October 2011, US Gypsum reported that "[c]urrently, there is significant excess wallboard production capacity industry wide in the United States. Industry capacity in the United States was approximately 32.9 billion square feet. We estimate that the industry capacity utilization rate was approximately 52% during the first nine months of 2010. We

24

project that the industry capacity utilization will remain at approximately that level for the balance of 2011." Industry analysts have recognized the downward pressure this creates on pricing noting, for example, that wallboard prices have tended to weaken historically when the industry's rate of capacity utilization has declined below 90%.

95.     Without all of the Defendants implementing significant price increases, each of the Defendant's respective self-interest would have dictated price cutting, or at least price moderation, to undercut their rivals' price increases. If only one or a few of the Defendants had increased their prices in the existing soft market, they would have lost sales, customers and market share to the Defendants who did not raise prices. No one Defendant would have had the leverage to increase prices profitably for drywall to this degree absent collusion.

96.     During the 2012 year, defendants communicated to customers that they should expect a similarly-large price increase for the 2013 year as was implemented at the start of 2012. These letters to customers from various defendants all listed the same effective date – January 1, 2013 – and announced the identical price increase of 30%. In March, Defendant American Gypsum publicized to customers that the company's estimated 2013 price range would total 25 to 30% above the January 2012 increase. American Gypsum blamed this spike on "increases and manufacturing and transportation costs." Defendant National Gypsum told customers in September 2012 that prices for wallboard products would rise by 30% as of January 2013. Similarly, in a October 2012 letter, Defendant LaFarge Gypsum announced a 30% increase on all wallboard products.

**B.    Defendants' Concerted Elimination of Job Quotes**

97.    At virtually the same time as the price increase announcement in 2011, each of the Defendants also in a drastic departure from prior industry practice, abruptly abolished its use of a decades-old competitive pricing practice known as job quotes.

98.    This practice was used throughout the drywall industry and was a central component of each Defendant's business model.  Job quotes permitted customers to lock in the price of drywall for the entire course of a construction project.  Notwithstanding the pivotal role this pricing model had historically played in the industry for more than four decades, each Defendant abruptly eliminated the practice in late 2011, at the same time that they put in place the industry-wide price increases described above.

99.    Prior to this abrupt change in the longstanding industry practice, the "job quote" policy protected Defendants' customers from price increases occurring during their respective construction projects or "jobs" by allowing customers to lock in the prices for drywall (sometimes with specified price increases allowed) at the beginning of the project.  It also provided a mechanism for price competition between manufacturers.  But the collusive change in the industry pricing model shifted that risk of future price increases squarely to customers and was expressly designed to allow Defendants to profit from both this and any future price increases.

100.    Moreover, the elimination of competitive job quotes facilitated collusion because it made pricing more consistent throughout the industry and thus allowed Defendants to more easily monitor and detect cheating from the conspiracy.  Prior to the elimination of job quotes, as much as 70 percent of all drywall was sold pursuant to a job quote.  If job quotes had remained in place, a Defendant's failure to implement collusive price increases would not necessarily mean defection from a conspiracy, but could simply be pricing consistent with the job quote practice.  With the

26

practice eliminated, however, any failure to impose price increases on customers would be more readily recognized by co-conspirators as cheating. Thus, by collusively eliminating the job quote policy, Defendants not only ensured more immediate and consistent implementation of their conspiratorial 2012 price increase, but facilitated the monitoring of the conspiracy.

101. The job quote pricing model had been a well-ingrained industry practice for over four decades and purchasers received this price protection for a substantial portion of drywall purchases. Accordingly, any one Defendant seeking to eliminate these competitive price terms by itself would have been met with opposition and likely defections from customers. Only through coordination, therefore, was the reversal and elimination of this long-standing practice possible. Without all of the Defendants eliminating job quote pricing, a Defendant would have lost significant market share to competitors who continued to provide job quotes. The conspiracy, however, allowed Defendants to effectuate this historically unprecedented change in price structure.

102. Until 2011, it was a standard competitive practice in the industry to allow purchasers of drywall to negotiate job quotes with the Defendants. Prior to implementation of Defendants' conspiracy, as much as 70 percent of all drywall was sold pursuant to a job quote. One distributor described this price protection practice as "ingrained" in the industry.

103. The agreement to eliminate this form of price competition facilitated Defendants' tracking and monitoring of cartel members' prices, and thus the enforcement of the conspiracy. The use of job quotes made competitor pricing in the industry relatively opaque. With job quote pricing in place, it thus would be harder for one cartel member to determine whether a low price given to a particular customer by another cartel member was pursuant to a job quote or was instead a defection from the cartel price. Without job quotes, Defendants would be much better able to

27

monitor and discipline other cartel members in furtherance of their overall price-fixing conspiracy. By collectively eliminating this form of price competition, the Defendants ensured that each of them could much more easily, accurately and comprehensively learn each other's prices. Thus, the elimination of job quotes both facilitated the coordinated price hikes and the policing of the conspiracy.

104.     The primary effect of Defendants' agreement to eliminate job quotes was to increase the price of drywall.  Recent reports have confirmed that the elimination of job quotes coupled with the announcement of a single higher price that will remain in place for the entire year has resulted in a sharp rise in wallboard prices in 2012.

105.     The letters alerting purchasers about the discontinuation of job quotes closely mirrored one another:

- "Our past job quote policy is no longer appropriate as we seek to improve the consistency and administrative efficiency of our pricing policies.  In light of the changing market, USG will no longer offer job quotes and/or price protection on wallboard, effective immediately." (USG letter, September 28, 2011)

- "The practice of providing job quotes is broken and counterproductive to meaningful and consistent price management needed to support profitability.  Therefore, effective immediately, we will discontinue for all product lines the policy of providing job quotes." (National Gypsum letter, September 30, 2011).

- "In review of our business practices and policies for bringing products to market, we have noted a significant increase in the amount of job quote requests and find the process to be inefficient and administratively burdensome.  Accordingly we find it necessary to cease all job quotes immediately." (CertainTeed letter, October 3, 2011).

- "Effective immediately, we will no longer be providing job quotes." (American Gypsum Letter, September 20, 2011).

- "… [E]ffective immediately, we will cease all job quotations." (LaFarge Gypsum Letter, October 4, 2011).

- "Effective immediately, PABCO Gypsum will discontinue the policy of providing job quotes." (PABCO Gypsum Letter, October 12, 2011).

106.    It would have been against the self-interest of any one Defendant to eliminate the job quote pricing practice unilaterally.   Absent collusion, any Defendant who was unwilling to offer this competitive pricing term would have lost sales and market share to competitors who continued to offer this price protection to customers.   No one Defendant would have had the leverage to eliminate this form of competition by itself; only by conspiring could Defendants have effectively eliminated this practice.   Thus, the agreement to eliminate job quotes reduces competition between the Defendants.

107.    Since the Defendants announced the discontinuation of job quotes in the fall of 2011, each of the Defendants has continued to make this price protection unavailable to customers. For example, on September 6, 2012, National Gypsum told customers that "our elimination of the practice of providing job quotes remains in effect and is strictly enforced."   On September 13, 2012, CertainTeed told customers that it "continues our policy of not providing price quotes to customers for specific projects." The other Defendants have, in like manner, adhered to the elimination of job quotes imposed by all of the conspirators in late 2011.

### C.    Defendants' Concerted Supply Restrictions

108.    In conjunction with the price increases described herein, Defendants have also imposed restrictions on the supply of drywall that will be made available to distributors.   For example, distributors and/or customers were informed by USG, National Gypsum, American Gypsum, PABCO, CertainTeed and Georgia Pacific in or about September 2011, that they were not permitted to purchase supplies of drywall that exceeded earlier purchases during the year. These supply restrictions facilitated the Defendants' ability to impose and maintain the price increases described herein.

109.    These supply restrictions were put in place even though there was substantial overcapacity in the industry.  (In fact, the industry was barely operating at fifty percent of its actual capacity.)  It would have been contrary to the unilateral interests of any Defendant to restrict its supply of drywall to customers absent the conspiracy because customers would have turned to competing suppliers to meet their needs.  Similarly, because of limited demand for drywall and substantial overcapacity, no manufacturer could have imposed and maintained large price increases or eliminated longstanding competitive pricing practices such as job quotes in the absence of a conspiracy.

110.    Because of this underutilized capacity, it would have been contrary to the independent interests of any individual Defendant to restrict the supply of drywall made available to its purchasers.  If an individual manufacturer withheld supply from a purchaser, the purchaser could – in an unrestrained marketplace – approach competing manufacturers with unused capacity.  Thus, a manufacturer restricting supply to a customer unilaterally would risk not only loss of that specific business, but could also jeopardize the customer relationship by encouraging the customer to do business with a competitor.  The conspiracy, however, has allowed each Defendant to impose large price increases and supply restraints without fear of losing business to its co-conspirators.

111.    To help enforce supply restrictions, Defendants have notified and/or monitored distributors to ensure that they did not build up surplus inventory to circumvent price increases.  Pursuant to the conspiracy, Defendants have alerted co-conspirators when a particular distributor appears to be accumulating excess supply and have notified the distributor that its purchases are being monitored.

**D.      Defendants' Most Recent Coordinated Price Increase Now Going Into Effect**

112.     Although demand has modestly improved, Defendants continue to impose price increases that are significantly out of proportion to changes in demand.  The Defendants have recently informed customers that they will impose another round of large price increases.  These increases will again were scheduled implemented on the same date (January 1, 2013), and to again remain in place for the same duration (throughout 2013).  For example:

- On August 22, 2012, Defendant American Gypsum told its customers that it would impose a 25% price increase on all gypsum board products on January 1, 2013 and that price increase would apply to all work performed in 2013.

  On September 6, 2012, Defendant National Gypsum told its customers that it "will increase prices on its entire Gypsum Wallboard product line … by 30% across the board.  It is once again, our intention that this increase will be good for the entire calendar year of 2013.  In addition, our elimination of the practice of providing job quotes remains in effect and is strictly enforced." (Emphasis in original).

- On September 13, 2012, Defendant CertainTeed told customers that it "will increase price effective with shipments on January 2, 2013 by 30%.  This increase amount will apply to all gypsum board products and is intended to be in effect for the entire year." Certain Teed also stated that it was continuing "our policy of not providing job quotes to customers for specific projects."

- On October 15, 2012, Defendant LaFarge told its customers that effective January 1, 2013, it would increase the price of all wallboard products by 30% and "[t]his price increase applies to all our gypsum board products and it intended to be in effect for all of 2013."

- On October 24, 2012, Defendant PABCO Gypsum told its customers that "[e]ffective January 1, 2013, PABCO Gypsum will implement at 30% price increase across all product lines.  This increase will establish pricing for the Calendar Year 2013."

- At or about the same time, USG, Temple-Inland and Georgia Pacific have also informed customers that substantial price increases will be imposed effective January 1, 2013, that those price increases will remain in effect throughout the year, and that their policy of eliminating job quotes remains in place.

113.     Drywall prices increased on or about January 1, 2013.

114.     The Defendants are imposing these additional price increases even though there continues to be substantial overcapacity in the industry.  Absent the conspiracy, it would be contrary to the interest of any Defendant to impose such large increases because of the incentive of

31

other manufacturers with underutilized capacity to undercut such a large price increase. As USG again acknowledged in April, "there is significant excess wallboard production capacity industry-wide in the United States. Industry capacity in the United States was approximately 31.9 billion square feet as of January 1, 2012. We estimate that the industry capacity utilization was approximately 54% during the first quarter of 2012 compared to 51% during the first quarter of 2011 and 56% during the fourth quarter of 2011. We project that the industry capacity utilization rate will remain at approximately the current level for the balance of 2012." USG recognized that "such a low level of capacity utilization" puts "pressure on gypsum wallboard selling prices and gross margins."

115.    The Defendants are also maintaining supply restrictions to facilitate the coordinated imposition of another round of large price increases. For example, USG, National Gypsum, American Gypsum, Temple-Inland, Lafarge, CertainTeed and Georgia-Pacific have all begun communicating and imposing supply restrictions limiting the ability of distributors to purchase larger amounts in late 2012. USG has indicated that on or about September 18, 2012, it "put in a controlled distribution policy for our customers" and, as a result, customers "know there's a ceiling on what they can purchase."

116.    During the same time period, the other Defendants have imposed similar supply restraints. The Defendants are imposing those supply restrictions even though they are substantially underutilizing their capacity. Absent the conspiracy, it would not be in the independent interest of any Defendant to impose such a supply restraint unilaterally, because its competitors could gain a significant competitive advantage by providing the drywall that is being withheld.

## VII.     FRAUDULENT CONCEALMENT

117.     Throughout the Class Period, Defendants engaged in a successful, illegal price-fixing and supply control conspiracy that was self-concealing. Defendants effectively, affirmatively and fraudulently concealed their unlawful combination, conspiracy and acts in furtherance thereof from Plaintiff and the members of the Classes.

118.     Plaintiff did not know, nor could have known, that prices for drywall were artificially inflated and maintained by virtue of Defendants' illegal price fixing conspiracy, and that Plaintiff and members of the Class were paying higher prices as a result.

119.     Plaintiff has exercised due diligence by promptly investigating the facts giving rise to the claims asserted herein upon having reasonable suspicion of the existence of Defendants' conspiracy.

120.     As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff and the Class members have as a result of the anticompetitive conduct alleged in this complaint.

## VIII.     COUNT I: SHERMAN AND CLAYTON ANTITRUST ACTS FOR TREBLE DAMAGES AGAINST ALL DEFENDANTS

121.     Plaintiff realleges each allegation set forth above, as if fully set forth herein.

122.     Defendants intended to and actually did restrain trade.  They shared a conscious commit to a common scheme designed to achieve the unlawful objective of artificially fixing, raising, pegging, maintaining and stabilizing the price of drywall sold in the United States by coordinating price increase announcements, capacity restrictions, and anticompetitive sales and pricing policies.

33

123. Defendants have entered into a per se illegal price-fixing and output restriction conspiracy, in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

124. Plaintiff and other members of the Direct Purchaser Plaintiff Class have been injured in their business and property by reason of Defendants' violation of Section 1 of the Sherman Act within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15.

125. Beginning in at least January 2008, and continuing thereafter to the present, Defendants entered into an agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, or stabilize prices for drywall in the United States, including by announcing and implementing: coordinated price increases, output restrictions, and other restraints of trade, such as eliminating job pricing.

126. Plaintiff and the other Direct Purchaser Plaintiff Class members have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy, and agreement. Plaintiff and Direct Purchaser Plaintiff Class members have paid more for drywall than they otherwise would have paid in the absence of Defendants' conduct. This injury is of the type the federal antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

127. Plaintiff and Direct Purchaser Plaintiff Class members seek damages, to be trebled, pursuant to the Clayton Antitrust Act, and costs of suit, including reasonable attorneys' fees.

## IX.    COUNT II: SHERMAN AND CLAYTON ANTITRUST ACTS FOR INJUNCTIVE RELIEF AGAINST ALL DEFENDANTS

128. Plaintiff realleges each allegation set forth above, as if fully set forth herein.

129. Plaintiff and other members of the Direct Purchaser Plaintiff Class face the threat of being injured in their business and property by reason of Defendants' continuing violation of

34

Section 1 of the Sherman Act within the meaning of Sections 16 of the Clayton Act, 15 U.S.C. § 26.

130.    Plaintiff and the other Direct Purchaser Plaintiff Class members are threatened with the continuing and impending future injury to their business and property by reason of Defendants' unlawful combination, contract, conspiracy, and agreement.    Plaintiff and Direct Purchaser Plaintiff Class members are faced with the immediate threat of paying more for drywall than they otherwise would pay in the absence of Defendants' continuing conspiracy.    This injury is of the type the federal antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

131.    Plaintiff and Direct Purchaser Plaintiff Class members seek injunctive relief, pursuant to Section 16 the Clayton Antitrust Act, and costs of suit, including reasonable attorneys' fees.    Plaintiffs seek to enjoin Defendants' continuing conspiracy, including by Court Order preventing the implementation of the price increases set to take effect January 1, 2013 and reinstituting the standard practice job pricing.

## X.    COUNT III: UNJUST ENRICHMENT FOR DISGORGEMENT UNDER THE COMMON LAW OF NORTH CAROLINA

132.    Plaintiff realleges each allegation set forth above, as if fully set forth herein.

133.    Plaintiff and the Direct Purchaser Plaintiff Class conferred the benefit of increased profits upon Defendants by reason of Defendants conduct alleged herein.

134.    The benefit conferred upon Defendants was not conferred gratuitously or officiously by Plaintiff and the Direct Purchaser Plaintiff Class.

135.    The benefit conferred upon Defendants by Plaintiff and the Direct Purchaser Plaintiff Class is measurable.

35

136.    Defendants consciously accepted the benefit conferred upon them by Plaintiff and the Direct Purchaser Plaintiff Class.

137.    Defendants should be made to disgorge their ill-gotten gains to Plaintiff and the Direct Purchaser Plaintiff Class.

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.    That the Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure.

B.    That the conduct, contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants be adjudged to have been in violation of the Sherman Antitrust Act.

C.    That judgment be entered for Plaintiff and members of the Direct Purchaser Plaintiff Class against Defendants for three times the amount of damages sustained by Plaintiffs.

D.    That judgment be entered for Plaintiff and members of the Direct Purchaser Plaintiff Class against Defendants Plaintiff and members of the Direct Purchaser Plaintiff Class be awarded the costs of this action, including reasonable attorneys' fees.

F.    That Defendants be enjoined from implementing the January 1, 2013 price increases they have announced.

G.    That Defendants be made to resume the standard business practice of job pricing.

H.    That Defendants be made to disgorge their ill-gotten gains to Plaintiff and the Direct Purchaser Plaintiff Class.

I.    That Plaintiff and members of the Direct Purchaser Plaintiff Class have such other, further and different relief as the case may require and the Court may deem just and proper under the circumstances.

## XII.    DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.


Dated:  January 17, 2013

Respectfully submitted.

**THE VAN WINKLE LAW FIRM**

By: s/ David M. Wilkerson
    Larry S. McDevitt
    David M. Wilkerson
    11 North Market Street
    Asheville, NC 28801
    Telephone: 828-258-2991
    Fax:  828-255-0255
    E mail:  dwilkerson@vwlawfirm.com

*Counsel for Plaintiff and the Proposed Direct Purchaser Class*

*Of counsel*

Jay W. Eisenhofer
Linda P. Nussbaum
Peter A. Barile III
GRANT & EISENHOFER P.A.
485 Lexington Avenue
New York, NY 10017
Tel:     (646) 722-8500
Fax:     (646) 722-8501
jeisenhofer@gelaw.com
lnussbaum@gelaw.com
pbarile@gelaw.com

Michael E. Criden
Kevin B. Love
CRIDEN & LOVE, P.A.
7301 S.W. 57th Court, Suite 515
South Miami, FL 33143
Tel:  (305) 357-9000
Fax:  (305) 357-9050

38